# SUPREME COURT OF THE UNITED STATES

————

No. 19A1071

————

## BONNIE RAYSOR, ET AL. *v.* RON DeSANTIS, GOVERNOR OF FLORIDA, ET AL.

ON APPLICATION TO VACATE STAY

[July 16, 2020]

The application to vacate stay presented to JUSTICE THOMAS and by him referred to the Court is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, dissenting from denial of application to vacate stay.

This Court's order prevents thousands of otherwise eligible voters from participating in Florida's primary election simply because they are poor. And it allows the Court of Appeals for the Eleventh Circuit to disrupt Florida's election process just days before the July 20 voter-registration deadline for the August primary, even though a preliminary injunction had been in place for nearly a year and a Federal District Court had found the State's pay-to-vote scheme unconstitutional after an 8-day trial. I would grant the application to vacate the Eleventh Circuit's stay.

I

This case implicates the "'fundamental political right' to vote." *Purcell* v. *Gonzalez*, 549 U. S. 1, 4 (2006) (*per curiam*). In 2018, the citizens of Florida amended their State Constitution to restore this basic right to persons with felony convictions who had completed "'all terms'" of their sentences. See *Jones* v. *Governor of Fla.*, 950 F. 3d 795, 800 (CA11 2020) (*Jones I*). Florida's Legislature and high court have interpreted the amendment to condition voting eligibility on payment of all fines, fees, and restitution imposed

as part of a sentence. *Id.*, at 800, 803–804; see also Fla. Stat. §98.0751 (2020 Cum. Supp.); *Advisory Opinion to Governor re: Implementation of Amdt. 4*, *The Voting Restoration Amdt.*, 288 So. 3d 1070, 1081 (Fla. 2020). Under this scheme, nearly a million otherwise-eligible citizens cannot vote unless they pay money.

Well before the August 18, 2020, Florida primary, several indigent persons with felony convictions challenged the constitutionality of Florida's voter paywall. Among other things, they claimed that this system violates the Equal Protection Clause, the Due Process Clause, and the Twenty-fourth Amendment.

In October 2019, the United States District Court for the Southern District of Florida issued a preliminary injunction, concluding that the plaintiffs were likely to show that Florida's pay-to-vote scheme constitutes wealth discrimination in violation of the Equal Protection Clause. See *Jones I*, 950 F. 3d, at 805. The court enjoined state officials from preventing the plaintiffs from registering to vote, or from voting, simply because they are unable to pay their outstanding legal financial obligations (LFOs). See *ibid.*

Months later, the Eleventh Circuit affirmed. It too determined that the plaintiffs were likely to succeed on their equal protection claims. *Id.*, at 817. The Eleventh Circuit further found that Florida's pay-to-vote scheme would fail rational-basis review as applied to indigent persons, *id.*, at 810–813, and may also fail as applied to all persons with felony convictions if "a substantial enough proportion" of them genuinely "cannot pay," *id.*, at 814. The Eleventh Circuit declined to rehear the case en banc. For months, then, the Eleventh Circuit's decision in *Jones I* has set out the legal rights of indigent would-be voters like the plaintiffs here.

With the preliminary injunction still in place, the District Court certified a class of prospective voters on the equal protection and Twenty-fourth Amendment claims and held

a bench trial. The 8-day trial included thousands of records and testimony from the plaintiffs, state and county officials, public defenders, and experts. On May 24, 2020, the District Court entered a permanent injunction and issued its factual findings and legal conclusions in a 125-page opinion. See generally *Jones* v. *DeSantis*, ___ F. Supp. 3d ___, 2020 WL 2618062 (ND Fla., May 24, 2020) (*Jones II*).

The District Court first found an equal protection violation. Guided by the Eleventh Circuit's controlling analysis in *Jones I*, the District Court concluded that Florida's pay-to-vote system creates an unconstitutional wealth barrier to voting. *Jones II*, ___ F. Supp. 3d, at ___, 2020 WL 2618062, *14. The court held that the system lacks any rational basis, finding "as a fact" that "the overwhelming majority of felons who have not paid their LFOs in full, but who are otherwise eligible to vote, are genuinely unable to pay the required amount." *Id.,* at ___, 2020 WL 2618062, *16. There was no sound reason, the District Court concluded, for Florida's decision to bar ballot access on the basis of indigence. *Ibid.*

Next, the District Court held that Florida's scheme violates due process. Crediting expert testimony, the court determined that "many felons do not know, and some have no way to find out, the amount of LFOs included in a judgment." *Ibid.* Not only does Florida provide individuals inconsistent information, but the State's own records are incomplete and unreliable; the District Court even found that Florida lacks records of restitution payments it has received. *Id.*, at ___, 2020 WL 2618062, *16–*20. Based on the State's estimates, moreover, the District Court noted that Florida officials would need about six years to determine how much (if anything) currently registered voters (to say nothing of those who seek to register) must pay to vote. *Id.*, at ___, 2020 WL 2618062, *24. Compounding the problem, the District Court found, is that Florida law puts the

risk of error on the prospective voter, suggesting on its registration forms that a false affirmation of voting eligibility is a felony "regardless of willfulness." *Id.*, at ___, 2020 WL 2618062, *25.

Last, the District Court concluded that Florida's payment requirement is a tax abridging the right to vote in violation of the Twenty-fourth Amendment. *Id.*, at ___, 2020 WL 2618062, *29. In the District Court's view, the required payments are taxes because Florida assesses them "regardless of" a defendant's "culpability," and for the "sole" or "primary purpose of raising revenue to pay for government operations—for things the state must provide, such as a criminal-justice system, or things the state chooses to provide, such as a victim-compensation fund." *Ibid.*

Having found several grounds for awarding relief, the District Court prescribed remedies tailored to the State's existing procedures. In effect, the District Court's remedies created a rebuttable presumption of inability to pay for any person who the State had already determined was indigent. *Id.*, at ___, 2020 WL 2618062, *43. At the State's suggestion, *id.*, at ___, 2020 WL 2618062, *42–*43, the District Court required the Secretary of State to permit voters to seek an advisory opinion from Florida's Division of Elections regarding the amount owed or their inability to pay, *id.*, at ___, 2020 WL 2618062, *44–*46. The court also ordered that a person could register and vote without being prosecuted if the division did not provide a timely advisory opinion within 21 days. *Ibid.*

On July 1, 2020—over a month after the District Court's judgment and 19 days before the voter-registration deadline—the Eleventh Circuit stayed the permanent injunction pending appeal. The Court of Appeals provided no reasons for its order.

## II

This Court errs in refusing to vacate that stay. The Court

may vacate an appellate court stay where (1) the case "could and very likely would be reviewed here upon final disposition in the court of appeals," (2) "the rights of the parties . . . may be seriously and irreparably injured by the stay," and (3) "the court of appeals is demonstrably wrong in its application of accepted standards in deciding to issue the stay." *Coleman* v. *Paccar Inc.*, 424 U. S. 1301, 1304 (1976) (Rehnquist, J., in chambers). Although the Court exercises this power sparingly, it has done so in voting-rights cases like this one. See, *e.g.*, *Frank* v. *Walker*, 574 U. S. 929 (2014) (vacating Court of Appeals stay of permanent injunction).

This case easily meets the first two *Coleman* prongs. By the District Court's count, "nearly a million" persons are barred from voting because of Florida's alleged wealth discrimination, inscrutable processes, and tax. See *Jones II*, \_\_\_ F. Supp. 3d, at \_\_\_, 2020 WL 2618062, *1. A case implicating the franchise of almost a million people is exceptionally important and likely to warrant review. See this Court's Rule 10. And there is no question that these people would suffer irreparable harm were they denied the vote or "incentiv[ized] to remain away from the polls" because of the Eleventh Circuit's conflicting orders or Florida's threat of prosecution. *Purcell*, 549 U. S., at 5. By contrast, the State has not shown comparable injury, especially because the District Court's remedies employ existing state procedures that the State itself proposed. *Jones II*, \_\_\_ F. Supp. 3d, at \_\_\_, 2020 WL 2618062, *42–*43.

As for the third prong, the Eleventh Circuit was "demonstrably wrong in its application of accepted standards in deciding to issue the stay." *Coleman*, 424 U. S., at 1304. The Court of Appeals not only failed to defer to the District Court's factual findings, but it also appears to contradict its prior view of the plaintiffs' equal protection claims. For starters, the District Court made extensive "factual findings to which the Court of Appeals owed deference," *Purcell*,

549 U. S., at 5, including that Florida's pay-to-vote scheme overwhelmingly affects the indigent and is intended to fund state services regardless of any person's criminal culpability, *Jones II*, ___ F. Supp. 3d, at ___, ___, 2020 WL 2618062, *16, *29. The Eleventh Circuit's "bare order" staying the District Court's decision does not "provide any factual findings or indeed any reasoning of its own," and "[t]here has been no explanation given by the Court of Appeals showing the ruling and findings of the District Court to be incorrect." *Purcell*, 549 U. S., at 5. The law required the Eleventh Circuit to "give deference to the discretion of the District Court," but there is "no indication that it did so." *Ibid.* That is the precise error this Court corrected in *Purcell*.

Equally important, the Eleventh Circuit has created the very "confusion" and voter chill that *Purcell* counsels courts to avoid. *Ibid.* Precisely because the District Court's decision in *Jones II* tracked the Eleventh Circuit's decision in *Jones I*, the stay upends the legal status quo nearly a year after the preliminary injunction took effect. Moreover, the Eleventh Circuit did not vacate *Jones I*—a point that further obfuscates the state of the law for would-be voters just 19 days before the voter-registration deadline. No doubt tens of thousands of Floridians with felony convictions have already registered to vote: That is precisely what *Jones I* said they could do. The State even admitted at trial that 85,000 registrations needed screening based on prior felony convictions (including eligibility involving LFOs). *Jones II*, ___ F. Supp. 3d, at ___, 2020 WL 2618062, *24. Those who registered in reliance on the preliminary and permanent injunctions will remain on the voter rolls despite the Eleventh Circuit's stay. See *ibid.* (finding that it would take the State about six years to review these records). Yet because of the Eleventh Circuit's decision, these voters will have no notice of their potential ineligibility or the resulting criminal prosecution they may face for failing to follow the abrupt change in law. Making matters worse, the Eleventh Circuit will

not hear argument on this case until August 18, the day of the primary election.

In short, the plaintiffs have raised serious claims, some of which the Eleventh Circuit already found likely to succeed. Because the parties' rights and the legal framework had been well established, it was error to for the Eleventh Circuit to reverse course in an unexplained stay order right before an election.

\*    \*    \*

This Court's inaction continues a trend of condoning disfranchisement. Ironically, this Court has wielded *Purcell* as a reason to forbid courts to make voting safer during a pandemic, overriding two federal courts because any safety-related changes supposedly came too close to election day. See *Republican National Committee* v. *Democratic National Committee*, 589 U. S. \_\_\_ (2020) (*per curiam*). Now, faced with an appellate court stay that disrupts a legal status quo and risks immense disfranchisement—a situation that *Purcell* sought to avoid—the Court balks.

I respectfully dissent.