# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 20-3121

———————————————

Organization for Black Struggle; St. Louis A. Philip Randolph Institute; Greater Kansas City A. Philip Randolph Institute; National Council of Jewish Women, St. Louis; Missouri Faith Voices

*Plaintiffs - Appellees*

v.

John R. Ashcroft, in his official capacity as Missouri Secretary of State

*Defendant - Appellant*

Greene County Clerk's Office; Jackson County Election Board; St. Charles County Election Authority; St. Louis County Election Board

*Defendant*s

AARP; AARP Foundation

*Amici Curiae*

——————————

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

——————————

Submitted: October 12, 2020
Filed: October 23, 2020

——————————

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

——————————

SHEPHERD, Circuit Judge.

The Organization for Black Struggle, the St. Louis A. Philip Randolph Institute, the Greater Kansas City A. Philip Randolph Institute, the National Council of Jewish Women St. Louis Section, and Missouri Faith Voices (Plaintiffs) sought a temporary restraining order and preliminary injunction against the enforcement of portions of Mo. Rev. Stat. § 115.302, which provides for voting by mail-in ballot due to the ongoing global pandemic. As relevant to this appeal, Plaintiffs alleged that the statute violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by treating mail-in ballots differently than absentee ballots, requiring the former to be returned by mail only while allowing the latter to be returned by mail or in-person, either from the voter himself or a relative within the second degree of consanguinity. The district court entered a preliminary injunction in favor of the Plaintiffs, and, on motion of John Ashcroft, in his capacity as the Missouri Secretary of State (the Secretary), entered a temporary administrative stay of the preliminary injunction.[1] The Secretary has appealed the district court's order and also moved to stay the injunction pending appeal. For the following reasons, we grant the Secretary's motion to stay the injunction pending disposition of the appeal.

I.

In June 2020, in response to the ongoing COVID-19 pandemic, the Missouri Legislature enacted Senate Bill 631, which amended the statutory provision regarding absentee ballots and created a new statutory provision allowing mail-in

---

[1]Before the district court, Plaintiffs also argued that the mail-in ballot provision violated the Equal Protection Clause based on the differences between applying for an absentee ballot and applying for a mail-in ballot. They further argued that they were entitled to injunctive relief under the materiality provision of the Civil Rights Act based on the State's rejection of ballot applications and ballots for immaterial errors and failure to provide voters with a meaningful opportunity to cure any ballot defects before rejecting the ballot. The district court denied relief on those bases, and they are not at issue on appeal.

ballots for remaining 2020 elections. The law added a new category of voters eligible to cast absentee ballots—individuals who are in an at-risk category for COVID-19—and allowed all Missouri registered voters to cast a mail-in ballot. By the terms of the law, these changes will remain in effect only until December 31, 2020.

Although the rules for casting absentee or mail-in ballots largely mirror one another, there is one notable difference: while absentee voters may return their ballots by mail or in person—delivering the ballot to the election authority themselves or through a relative within the second degree of consanguinity—mail-in voters may return their ballots only through United States Postal Service (USPS) mail. Both mail-in and absentee ballots must be received by the close of polls on election day, and election authorities may not count ballots received after the 7:00 p.m. deadline. As relevant to this appeal, Plaintiffs argued that this difference between absentee and mail-in ballots resulted in an equal protection violation because the differing treatment between the groups placed an undue burden on the right to vote for those seeking to avail themselves of the mail-in ballot procedures.

The district court concluded that, while the burden on the right to vote by requiring return of mail-in ballots by USPS mail was seemingly minimal, the risk of total disenfranchisement to the voter, through no fault of his or her own, combined with the existing procedures in place to accommodate the return of remote ballots to the election authority, demonstrated Plaintiffs' likelihood of success on the merits. The district court also found that the remaining Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981), factors for granting a preliminary injunction—irreparable harm, balance of the harms, and the public interest— weighed in favor of granting the injunction.

The district court thus granted in part Plaintiffs' motion for a preliminary injunction and temporary restraining order and ordered the State to allow mail-ballots to be received by the same method as absentee ballots. The district court further ordered the State to immediately take steps to abide by the order, including

informing the voting public that mail-in ballots could be returned in person. When the Secretary notified the district court of his intent to appeal the ruling, he also requested that the district court enter a temporary administrative stay to allow both the district court and the Eighth Circuit to rule on a request for stay pending appeal. The district court granted the motion. Now before us is the Secretary's motion for a stay pending appeal.

## II.

In determining whether to issue a stay pending appeal, we consider four factors: (1) whether the party seeking the stay has demonstrated a strong likelihood of success on the merits; (2) whether the party seeking the stay will be irreparably injured without a stay; (3) whether a stay would substantially injure other parties; and (4) the public's interest. Brakebill v. Jaeger, 905 F.3d 553, 557 (8th Cir. 2018) (citing Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." Id.

First, the Secretary has shown a strong likelihood of success on the merits.[2] We evaluate the Secretary's likelihood of success under the so-called Anderson-Burdick standard, which we apply to determine the proper level of scrutiny in considering the constitutionality of a statute implicating the right to vote. See Burdick v. Takushi, 504 U.S. 428, 433 (1992) ("Each provision of a code . . . 'inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983))). Under this standard,

> [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected

---

[2]In evaluating the Secretary's likelihood of success on the merits, we address only the merits of Plaintiffs' claim. We do not address the Secretary's argument regarding the cognizability of a § 1983 claim and express no opinion on the merits of that argument.

- 4 -

by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Id. at 434 (quoting Anderson, 460 U.S. at 789). Where a statute imposes a severe burden on a plaintiff's rights, it must be "narrowly tailored and advance a compelling state interest." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" Id. (citation omitted).

The challenged legislation imposes changes that are offered in addition to in-person voting, rather than as a replacement for in-person voting. As other courts have stated, "as long as the state allows voting in person, there is no constitutional right to vote by mail." Common Cause Ind. v. Lawson, No. 20-2911, 2020 WL 6042121, at *1 (7th Cir. Oct. 13, 2020). And the changes impose a de minimis burden on voters if they are concerned that their ballots will not be received by the election board on time: they simply may make arrangements to put completed ballots in the mail earlier. Regarding the Plaintiffs' claims about the unreliability of the USPS, the Plaintiffs have presented weak evidence. Plaintiffs have presented nothing more than anecdotal evidence of the unreliability of the USPS or delivery delays, along with advice from the USPS that early mailing of ballots to mail-in voters and early return of ballots is the best way to ensure that all ballots are received and counted. The evidence presented by the State shows that in the August 2020 elections, a small percentage of total absentee and mail-in ballots, only 1 percent, was rejected because an absentee or mail-in ballot was received after the deadline. There is also no evidence in the record regarding when rejected mail-in ballots were postmarked, which makes it impossible to ascertain if the late receipt of ballots was due to USPS delays.

Because the alleged burden of returning a ballot by mail is not severe (indeed it imposes a lesser burden than would be required of in-person delivery), the State is not required to demonstrate a compelling state interest. Timmons, 520 U.S. at 358. And the likelihood that some ballots are likely to be rejected as being received after the deadline does not transform the burden into one that is severe. See New Ga. Project v. Raffensperger, No. 20-13360, 2020 WL 5877588, at *2 (11th Cir. Oct. 2, 2020) ("In the end, as a legal matter, it is just not enough to conclude that if some ballots are likely to be rejected because of a rule, 'the burden on many voters will be severe.'" (citation omitted)). Given the foregoing, it is a reasonable and rational exercise of the State's authority to regulate elections to require the return of mail-in ballots by 7:00 p.m. on election day via the USPS, in light of the pandemic concerns about in-person delivery at a polling place. It was these concerns which clearly motivated the temporary statutory change in the first place. The Missouri Legislature is entrusted with the responsibility and authority to weigh relevant considerations and proposals and craft legislation. Our review is limited to considering only the constitutionality of Missouri's mail-in voting procedures. See Ferguson v. Skrupa, 372 U.S. 726, 730 (1963) ("[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. . . . We refuse to sit as a 'superlegislature to weigh the wisdom of legislation' . . . ." (citation omitted)).

Further, as the Seventh Circuit acknowledged in Common Cause Indiana v. Lawson, "[a]s long as it is possible to vote in person, the rules for absentee ballots are constitutionally valid if they are supported by a rational basis and do not discriminate based on a forbidden characteristic such as race or sex." 2020 WL 6042121, at *1. The same holds true for mail-in ballots, and the evidence does not demonstrate that the State's decision to treat absentee and mail-in ballots differently in the single respect at issue in this case is in any way based on an impermissible discriminatory reason. The Seventh Circuit also sensibly acknowledged that voters who wait until the last minute, regardless of a pandemic, assume the risk that they may be unable to successfully cast their ballot. Id. "During a pandemic a reasonable person entitled to vote by mail transmits the ballot earlier than normal or uses another

approved method." Id. Because the requirement that mail-in ballots be returned by USPS mail is a minimal burden and a reasonable, nondiscriminatory restriction, the Secretary has shown a strong likelihood of success on the merits of his appeal. See Raffensperger, 2020 WL 5877588, at *3 ("Because the State's Election Day deadline imposes only a reasonable burden even on absentee voters who receive their ballots later than usual, the State's interests easily survive the Anderson-Burdick framework.").

Second, the Secretary has shown that the State will suffer irreparable harm if we do not grant a stay. If we do not grant a stay, the State will, in effect, be precluded from applying its duly enacted legislation regarding election procedures. See Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018) ("[T]he District Court's orders, for all intents and purposes, constituted injunctions barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature. Unless that statute is unconstitutional, this would seriously and irreparably harm the State . . . ." (footnote omitted); see also Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))). Prohibiting the State from enforcing a statute properly passed as part of its broad authority to regulate elections, see Timmons, 520 U.S. at 358, particularly where the State has shown a strong likelihood that the statute is not constitutionally infirm, would irreparably harm the State.

Finally, although the remaining factors of injury to other parties and the public's interest generally warrant lesser consideration than those of likelihood of success and irreparable harm, they, too, weigh in favor of granting the motion to stay. The public has an interest in the fair and orderly operation of elections, and the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020); see also Purcell

v. Gonzalez, 549 U.S. 1, 4-5 (2006) (per curiam). And the State's "interests in conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud," Raffensperger, 2020 WL 5877588, at *4, further serve the public's interest, as "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," Purcell, 549 U.S. at 4. And there can be little harm to other parties where, as the Eleventh Circuit noted, "a stay preserves the status quo and promotes confidence in our electoral system— assuring voters that all will play by the same, legislatively enacted rules." Raffensperger, 2020 WL 5877588, at *4. The Secretary has thus demonstrated that all factors weigh in favor of staying the district court's injunction pending appeal.

## III.

Accordingly, we grant the motion to stay the injunction pending appeal.

KELLY, Circuit Judge, dissenting.

During the 2020 election cycle, Missouri will allow voters to cast their ballots remotely. State legislation delineates two categories of remote voters. The first type of remote voter is the traditional "absentee voter." These voters must fit within one of seven statutorily enumerated categories of individuals that Missouri does not require to vote in person, whether due to disability, religious belief or—this year— membership in an "at-risk category" for COVID-19. Mo. Rev. Stat. § 115.277.1. The second type of remote voter is the "mail-in voter." This includes any Missouri voter who does not meet the statutory requirements to vote absentee but nonetheless wishes to vote remotely "to avoid the risk of contracting or transmitting" COVID-19. Id. § 115.302.20. At issue in this case is one important difference between these two types of voters: their options for returning their ballots. Absentee voters may return their ballots to the local election authority in person, have a close relative do so on their behalf, or mail the ballot in. By contrast, mail-in voters have only one option for returning their ballots: they must do so via the United States Postal Service. Id. § 115.302.12.

The district court concluded that this differential treatment causes mail-in voters to "run the risk of total disenfranchisement in the form of their vote not being counted because of delays not of the voter's own making." Because absentee voters can walk their completed ballots down to the local election authority, they have, as the district court put it, "less risk of total disenfranchisement" than mail-in voters, who must rely on USPS. Because Missouri provided no "reasonable justification for this different treatment of remote voters," the district court determined Plaintiffs were likely to succeed on the merits of their claim that the mail-in requirement unduly burdens the right to vote.

The district court accordingly granted narrow injunctive relief. It ordered Missouri to count any otherwise valid remote ballots—both absentee and mail-in—received by local election authorities, regardless of whether they are returned by mail or in person. Missouri appealed and now seeks a stay of the injunction pending appeal. I would deny the motion to stay because Missouri's Secretary of State has not made the requisite showing that he is likely to succeed on the merits. See Hilton v. Braunskill, 481 U.S. 770, 776 (1987).

As an initial matter, I am cognizant of the concern that courts should "ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (citing Purcell v. Gonzalez, 549 U.S. 1 (2006)). When such alterations create confusion or tend to chill voters from casting ballots, judicial restraint makes eminent sense. See Purcell, 549 U.S. at 4–5. But here, the district court's injunctive relief does not so much change existing election procedures as it does more uniformly apply them to remote voters, with the aim of ensuring that mail-in votes are counted. In other words, there is little risk that the district court's order would "incentiv[ize voters] to remain away from the polls." See id. Just the opposite. Indeed, the risk of disenfranchisement is exactly the situation that Purcell sought to avoid. See Raysor v. DeSantis, 140 S. Ct. 2600, 2603 (2020) (mem.) (Sotomayor, J., dissenting).

Citizens have "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." Dunn v. Blumstein, 405 U.S. 330, 336 (1972). Any burden a state law imposes on individual voters or on a category of voters, "[h]owever slight that burden may appear . . . must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 191 (2008) (cleaned up); see Burdick v. Takushi, 504 U.S. 428, 434 (1992) ("A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule . . . .") (cleaned up). Here, the district court recognized that requiring some remote voters to return their ballots by mail, standing alone, may not be an onerous burden. In the context of necessary but unprecedented reliance on USPS to ensure that remote ballots reach local election authorities, however, this requirement imposes an undue risk that Missouri's mail-in voters may not have their ballots counted "even if they do everything right and plan well in advance."

Plaintiffs have submitted evidence demonstrating the substantial likelihood that some remote voters who return their ballots by mail will not have their votes counted. Affidavits from Missouri voters describe significant delays with USPS's mailing of ballots during the state's primaries. Although these particular voters were ultimately able to cast their ballots, they had to take additional steps to ensure their votes were counted. One voter, for example, requested her mail-in ballot 22 days before the deadline to do so. Her ballot did not arrive in the mail until five days before the election. This is despite efforts this voter made to track down her ballot by contacting both USPS and the local election authority. Another voter requested her absentee ballot eight days before the deadline. It did not arrive in the mail until election day. At this point, it would have been too late for her to return the ballot via USPS. The affidavits provided by Plaintiffs indicate a substantial likelihood that at least some remote voters who have no alternative but to rely on USPS to deliver their ballots by election day will be disenfranchised.

Even more indicative of the risk that some mail-in voters will be disenfranchised during this election cycle is a July 31, 2020 letter to the Secretary. In the letter, USPS describes Missouri's instructions to remote voters about when to mail their ballots as "incompatible" with mail-delivery timetables. USPS stresses that voters should mail their ballots "no later than Tuesday, October 27," a full week before the election, to ensure receipt by election day, Missouri's deadline to receive completed remote ballots. Yet, as the letter points out, Missouri permits voters to request mail-in ballots as late as October 21. For voters who request mail-in ballots "at or near [the] ballot-request deadline," USPS warns, "there is a significant risk that the voter will not have sufficient time to complete and mail the completed ballot back to the election official in time for it to arrive by the state's return deadline." The letter makes clear that even voters who follow Missouri's instructions for requesting and submitting mail-in ballots to the tee run the risk of being unwittingly disenfranchised. The evidence Plaintiffs presented may not be voluminous, but it is far from insignificant.

Saliently, the district court also found the Secretary had not identified any reasonable state interest that warrants treating one category of remote voters differently than another. There is little question that a state has "a compelling interest in preserving the integrity of its election process." Purcell, 549 U.S. at 4 (cleaned up). But interests such as these cannot merely be asserted in the abstract. See Dunn, 405 U.S. at 336 (explaining that before the right to vote can be restricted, "the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny"). Instead, the state interest must be linked in some meaningful way to the particular rule or regulation that allegedly imposes a burden on a citizen's right to vote. See Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1319 (11th Cir. 2019) ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."). Although Missouri asserts several state interests, none of them appears reasonably related to imposing a mail-in requirement on one category of remote voters but not the other.

- 11 -

The Secretary asserts, for example, an interest in avoiding "administrative burdens and attendant difficulties." But Missouri already has a procedure in place for the in-person return of absentee ballots. Indeed, as the district court noted, local election authorities "are already trained on the process." And regardless of how ballots are returned, the total number of remote ballots that local election officials receive will presumably remain similar. Thus, it is unclear how making this same procedure available to mail-in voters undermines the Secretary's claimed interest. On the contrary, doing so seems less administratively burdensome than Missouri's current system, which requires election officials to sort all dropped-off ballots to make sure no mail-in ballot mistakenly delivered in person is counted. Allowing local election authorities to accept *all* otherwise valid remote ballots, regardless of whether they are dropped off or mailed in, would eliminate this step.

The Secretary also expresses an interest in avoiding long lines at local election authorities. But absentee voters who wish to return their ballots in person (or have a close relative do it for them) may do so any time between now and 7:00 p.m. on election day. There is no evidence to suggest that a disproportionately large percentage of citizens who choose to vote remotely due to COVID-19 concerns, *i.e.*, mail-in voters, would choose to submit their ballots in person, or that those who do will all decide to drop their ballots off at the same time.

Similarly unpersuasive is the Secretary's assertion that providing all remote voters with the option to return their ballots in person will undermine Missouri's interest in "clarity and uniformity, and avoid[ing] voter confusion." On this point, the district court's narrow injunctive relief seems more likely to avert confusion than to sow it. It is difficult to understand how having one set of rules for all remote voters is more confusing than Missouri's current procedure, which treats two similar groups of remote voters differently. Finally, as to voter fraud, the Secretary fails

entirely to explain how allowing some Missourians, but not others, to submit their remote ballots in person would prevent fraud.[3]

The Secretary has likewise failed to show that he "will be irreparably injured absent a stay," see Hilton, 481 U.S. at 776. Missouri already has a procedure in place for processing some remote ballots returned to local election authorities by hand. The district court merely ordered that procedure also be made available to mail-in voters. Further, as the district court found, the task of informing local election authorities, other affected officials, and the voting public of this "simple message" imposes minimal harm or cost to Missouri. In contrast, the stay creates a significant risk that an unknown percentage of mail-in votes will not be counted, no matter how closely mail-in voters follow Missouri's instructions. Cf. id. (explaining that "whether issuance of the stay will substantially injure the other parties interested in the proceeding" is relevant in considering whether to issue a stay); Harper v. Va. State Bd. of Elections, 383 U.S. 663, 670 (1966) (affirming that the right to vote is a "precious" and "fundamental" right); Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined.").

Finally, the public interest would be served by maintaining the district court's injunction. "By definition, the public interest favors permitting as many qualified voters to vote as possible." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (quoting Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012)) (cleaned up). In the midst of a pandemic, Missouri responded to concerns about voter safety by expanding access to remote voting. Mo. State

---

[3]Mail-in voters must have their ballots notarized; absentee voters don't have to. Putting aside whether this requirement itself presents an undue burden, but see Mo. State Conf. of NAACP v. Missouri, —S.W.3d—, 2020 WL 5988505, at *6 (Mo. Oct. 9, 2020) (per curiam) (holding that the notary requirement does not infringe on the fundamental right to vote because there is no right to vote by absentee or mail-in ballot), the fact of notarization would presumably give the Secretary more faith, not less, in the legitimacy of a mail-in ballot, regardless of whether that ballot is mailed to or dropped off at the local election authority.

Conf. of NAACP, 2020 WL 5988505 at \*1.  The district court's preliminary injunction further serves the public interest by allowing all remote voters—not just absentee voters—to return their ballots either by mail or in person.  By ensuring that voters who want to limit their exposure to COVID-19 have the same options for returning their ballots as any other Missourian who votes remotely, the district court's limited injunctive relief reduces the substantial risk that mail-in voters will be disenfranchised even if they follow the Secretary's instructions.  With the district court's injunction in place, there can be no dispute that more, rather than fewer, Missourians would be able to exercise their right to vote and to have that vote counted.

I respectfully dissent.

_____